UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                 CRIMINAL NO. 13-109 (DSD/JSM)

Plaintiff,

v.                                    REPORT AND RECOMMENDATION

CEBRIAN OMAR SIMS

Defendant.

JANIE S. MAYERON, United States Magistrate Judge

The above matter came on for hearing before the undersigned, upon Cebrian Omar Sims' Motion to Suppress Eyewitness Identifications [Docket No. 21] and Motion to Suppress Statements, Admissions and Answers [Docket No. 22]. Assistant United States Attorney, Richard Newberry, Esq., appeared on behalf of the United States; Shannon R. Elkins, Esq. appeared on behalf of defendant Cebrian Omar Sims, who was personally present. The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

I.     **MOTION TO SUPPRESS EYEWITNESS IDENTIFICATIONS**

    A.     **Factual Background**

Sergeant Kent Cleveland of the St. Paul Police Department testified that on April 24, 2013, at approximately 4:00 p.m., he was called to respond to reports of a large fight near the area of Sherburne Avenue and Pascal Street. The reports indicated that approximately 20-30 participants were involved, some of whom were armed with bats and sticks. At least two gunshots were fired, and upon arrival at the scene, officers encountered a male victim who had received a gunshot wound to his hand.

When Sergeant Cleveland arrived at the scene, witnesses informed him that an individual with a gun was seen entering the Ultimate Looks Barber Shop, which is located approximately a block away from the scene of the fight. The front portion of Ultimate Looks is occupied by a women's beauty salon and the back portion of the store is occupied by a men's barber shop. Sergeant Cleveland and other officers cleared Ultimate Looks of all occupants and searched the building to determine if the suspect was still inside. In their search, officers uncovered a .357 revolver found on the floor of a hallway leading to a restroom. The weapon matched the description of the gun fired during the fight. Officers questioned all of the Ultimate Looks occupants, one at a time. Five male occupants, who were located in the rear barber shop, reported having seen a dark-skinned black male enter the building through the rear entrance. The witnesses described the individual as having a scruffy beard or goatee and wearing a white long-sleeve t-shirt. One witness reported that the suspect had walked towards the bathroom and returned shortly thereafter. An employee, T.T., stated that he recognized the suspect as a previous customer, but that he could not recall his name. T.T. also suggested that he did not pay much attention to the suspect when he entered the barber shop. Three female occupants, who were located in the beauty salon, reported that they had not seen anyone enter the store.

After speaking with the witnesses, Sergeant Cleveland returned to the scene of the fight, and spotted the defendant, Cebrian Omar Sims. Sergeant Cleveland realized that Sims matched the description of the suspect given by the witnesses at Ultimate Looks. Sergeant Cleveland walked over to Sims and told him to "come over here" so that he could talk to him. Sergeant Cleveland asked Sims whether he had been in the

barber shop. At first, Sims denied having been in the barber shop, but eventually admitted that he gone to the barber shop to ask about a haircut. Having determined that Sims was a suspect, Sergeant Cleveland then frisked and handcuffed Sims and placed him in the rear seat of Officer Todd Ludvik's police vehicle. Sergeant Cleveland testified that Officer Ludvik's car had no operative interior door handles. While Sims waited in the police vehicle, Officer Ludvik was sent to the barber shop to see if any of the witnesses questioned previously could identify the suspect as Sims. T.T. agreed to attempt to identify the suspect by way of a "one-man show-up." Sergeant Cleveland described the show-up, testifying that T.T. stood on a street corner behind Officer Ludvik, approximately 100-150 feet away from Officer Ludvik's vehicle, so as not to be seen by Sims. Officer Ludvik then signaled to Sergeant Cleveland to escort Sims out of the vehicle and into the middle of the street. Sims faced T.T. and T.T. identified Sims as the individual he had seen enter the barber shop. T.T. also stated that he had witnessed officers arresting Sims before the show-up. Sergeant Cleveland then placed Sims back in the rear seat of the police vehicle. Sims had waited in the vehicle for approximately ten minutes before the show-up began.

Sims has moved to suppress evidence of the one-man show-up. Sims argued that the circumstances surrounding the show-up were impermissibly suggestive. Defendant's Memorandum in Support of Motions to Suppress Statements, Admissions, and Answers, and Eyewitness Identifications [Docket No. 29] ("Def's. Mem."), p. 12. Sims contended that the show-up was impermissibly suggestive, because Sims was handcuffed during the show-up, squad cars and uniformed police officers could be seen in the vicinity, and T.T. had witnessed what he believed to be Sims' arrest beforehand.

3

Id., p. 13. Sims further claimed that T.T.'s identification was unreliable, because T.T. admitted that he had not paid much attention to the individual who entered the barber shop. Id.

In response, the Government maintained that the show-up was reliable, because T.T. had an opportunity to view the defendant, gave an accurate description of Sims, was certain that the suspect was Sims, and identified Sims as the suspect less than an hour after the crime. Government's Response to Defendant's Motions to Suppress Evidence [Docket No. 30] ("Gov't. Resp."), p. 5.

**B.    Analysis**

Courts engage in a two-stage inquiry to determine whether out-of-court eyewitness identifications are admissible, consistent with due process. U.S. v. Pickar, Crim. No. 08-0116 (PJS/SRN), 2008 WL 5412363 at *8 (D. Minn. 2008) (citing U.S. v. King, 148 F.3d 968, 970 (8th Cir. 1998). First, the Court must inquire whether the identification process used is unduly suggestive. Id.  Second, the Court must determine whether the procedure was reliable under the totality of the circumstances despite being unduly suggestive. Id.

An eyewitness identification process is unduly suggestive when the circumstances are "coercive" or witnesses "feel obligated to positively identify . . . so as not to disagree with the police, whose actions [exhibit a] belief that they apprehended the correct suspects." Clark v. Caspari, 274 F.3d 507, 511 (8th Cir. 2001) (finding the identification process unduly suggestive because officers told witnesses that more suspects would be presented than were shown and suspects were surrounded by officers, one of whom was carrying a shotgun). "Necessary incidents of on-the scene-

identifications, such as the suspects being handcuffed and in police custody, do not render the identification impermissibly suggestive." King, 148 F.3d at 970 (citing U.S. v. Bautista, 23 F.3d 726, 730 (2d Cir. 1994), cert. denied, 513 U.S. 862). The reliability of identification procedures is determined with reference to five factors: "(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation." Neil v. Biggers, 409 U.S. 188, 199-200 (1972).

The Court finds that the procedure used by Sergeant Cleveland and Officer Ludvik was not impermissibly suggestive. Although Sims was shown to T.T. while in handcuffs, this does not in and of itself make the procedure coercive. King, 148 F.3d at 970. Furthermore, while T.T. also stated that he witnessed Sergeant Cleveland putting Sims in handcuffs, there is no reason to believe that this would lead T.T. to feel any more obligated to identify Sims as the suspect than would the sight of Sims already in handcuffs. No evidence was presented to suggest that T.T. in any way felt obligated to positively identify Sims or to agree with the police,

Even if the identification procedure was unduly suggestive, the Court finds that in light of the totality of circumstances, the procedure was reliable. T.T. had a clear opportunity to see Sims enter the barber shop, T.T's description of the suspect matched Sims, T.T. was certain in his identification, and the length of time between Sims' appearance at the barber shop and the identification – less than an hour – was insubstantial. While T.T. stated that he had not been paying close attention to Sims

5

when he entered the shop, his recognition of Sims as a prior customer mitigates this concern. Moreover, given the strength of the other relevant factors, the Court finds that the procedure was reliable. Neil, 409 U.S. at 199-200. Finally, whereas here, the Court finds that the procedure was not unduly suggestive, it would be improper to suppress the identification on the grounds of reliability, as the question of reliability is best left to the jury. King, 148 F.3d at 970 ("Whether such factors cast doubt on the accuracy of a positive identification is an issue for the jury.") (citing U.S. v. Johnson, 540 F.2d 954, 960 (8th Cir. 1976), cert. denied 429 U.S. 1025). For all of these reasons, the Court recommends that Sims' Motion to Suppress Eyewitness Identification be denied.

### III. MOTION TO SUPPRESS STATEMENTS, ADMISSIONS AND ANSWERS

#### A. Factual Background

After the show-up, Sergeant Cleveland placed Sims back in Officer Ludvik's vehicle. At approximately 6:10 p.m., Sergeant Cleveland entered the vehicle and began to question Sims. Sergeant Cleveland asked Sims whether he had a criminal record and whether his DNA had been taken in association with his previous crimes. Def's. Ex. 1 (Dashboard Camera Recording of Interview). Sims stated that he had been convicted of burglary and attempting to flee the police. Sergeant Cleveland then escorted Sims out of the vehicle, informed Sims that he was not under arrest, and continued to question him. Sergeant Cleveland asked Sims if his fingerprints would be found on the gun located at the barber shop and whether he had handled the weapon previously. Sims responded that he was not sure whether his DNA would be found on the gun, but admitted that he had handled the weapon. Sergeant Cleveland also asked if he had ever been convicted of a crime as an adult, to which Sims responded that he had. After

approximately one or two minutes of questioning, Sergeant Cleveland informed Sims that he was under arrest.

According to Sergeant Cleveland, Sims did not ask to leave or to speak with an attorney at any point during the questioning. Sergeant Cleveland testified that he did not promise Sims anything or threaten him. Sergeant Cleveland stated that he did not deny Sims any physical needs such as food, water, or access to a restroom; however, Sims would not have had access to these needs without asking for permission, as he was handcuffed and locked in the police vehicle from the inside. According to Sergeant Cleveland, Sims was detained for approximately 15 minutes before his arrest.

After Sims' arrest, Officer Ludvik drove him to the Ramsey County Law Enforcement Center. Sergeant Kenneth Jensen was assigned to interrogate Sims upon his arrival. Prior to the interrogation, Sergeant Cleveland briefed Sergeant Jensen on his questioning of Sims. Sergeant Jensen testified that he used the incriminating statements Sims made to Sergeant Cleveland in his own interrogation. Before Sergeant Jensen began his interrogation, Sergeant Cleveland spoke with Sims again and told him that the best thing to do was be honest and that being honest would work in his favor.

At approximately 7:00 p.m., Sergeant Jensen read Sims his Miranda rights from a form. Gov't. Ex. 2. Both Sims and Sergeant Jensen signed the form. Id. Sergeant Jensen then explained to Sims that their conversation would be recorded. Sims did not ask to speak with an attorney nor did he object to questioning. Sergeant Jensen prefaced his interrogation by informing Sims that Sergeant Cleveland had apprised him of Sims' and Sergeant Cleveland's prior conversation. Sergeant Jensen stated that,

7

based on the conversation, he understood Sims' DNA may or may not be located on the gun. Gov't Ex. 1. After agreeing to DNA testing, Sims admitted that he had handled the weapon. Id.

Sims moved to suppress all statements made by Sims both before and after Sergeant Jensen read him his <u>Miranda</u> rights. In light of the surrounding circumstances, Sims argued that he had a reasonable belief that he was in custody when he spoke with Sergeant Cleveland. Def's Mem., p. 7. Therefore, because Sergeant Cleveland engaged in custodial interrogation without reading Sims his <u>Miranda</u> rights, the interrogation violated the Fifth and Sixth Amendments and the resulting statements must be suppressed. <u>Id.</u>, p. 8.

Sims further asserted that the statements made to Sergeant Jensen were the "fruit of the poisonous tree," because they would not have been made without the prior illegal interrogation by Sergeant Cleveland; the taint of illegality was not removed before the second interrogation, because the two interrogations were made within an hour of one another; the questions posed by Sergeants Cleveland and Jensen were substantially similar; and Sergeant Jensen intentionally informed Sims of his conversation with Sergeant Cleveland as a tactic to elicit an improper confession. <u>Id.,</u> pp. 8-11.

The Government countered that Sims was not in custody at the time when he made the statements to Sergeant Cleveland, and consequently, there was no basis for suppressing the statements. Gov't. Resp., pp. 6-8. The Government argued that Sims was clearly not under arrest at the time of the interrogation, Sims voluntarily acquiesced to the questioning, no strong arm tactics were employed, and the atmosphere during the

interrogation was not police dominated. Id., p. 8. The Government also contended that the statements made to Sergeant Jensen were not the "fruit of the poisonous tree," because Sergeant Cleveland's initial interrogation was not custodial in the first instance. Id., p. 9. The Government argued in the alternative, that even if the initial interrogation was improper, Sergeant Jensen's interrogation was still admissible, because the interrogations were conducted by two different officers, in two different locations, and were separated by more than an hour in time. Id., pp. 10-11.

### B. Sergeant Cleveland's Interrogation

Under Miranda, any statements made by defendants as a result of custodial interrogation are inadmissible unless the Government demonstrates that effective procedural safeguards were employed to ensure protection of the privilege against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 444 (1966). Effective procedural safeguards require that the defendant be informed that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." Id. For the purposes of Miranda, a custodial interrogation is any "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. In determining whether a defendant is in custody, the Eighth Circuit weighs and considers six factors:

> (1) Whether the suspect was informed at the time of the questioning that the questioning was voluntary; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police

> dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

U.S. v. Griffin, 922 F. 2d 1343, 1349 (8th Cir. 1990). The Eighth Circuit has since clarified that the Griffin factors are not exclusive, and that a determination of custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." U.S. v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004); U.S. v. Sanchez, 676 F.3d 627, 630-632 (8th Cir. 2012) (court continued to apply the Griffin factors while noting that the list is not exhaustive); U.S. v. Carlson, 613 F.3d 813, 817 (8th Cir. 2010) (same). "The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." Czichray, 378 F.3d at 828.

The Court finds that Sergeant Cleveland's questioning of Sims was a custodial interrogation for the purposes of Miranda. While Sims was eventually informed that he was not under arrest, this notice was not given until after Sergeant Cleveland escorted Sims out of the police vehicle. At this point Sergeant Cleveland had already asked Sims several questions and begun his interrogation. Further, contrary to the Government's assertions, Sergeant Cleveland did not testify that Sims was informed he could end the questioning at any time. See Gov't Resp., p. 8. Informing suspects that they are not under arrest is not equivalent to informing them that they are free to leave. See U.S. v. Ollie, 442 F.3d 1135, 1138 (8th Cir. 2006) ("While advising someone that he or she is not under arrest helps mitigate an interview's custodial nature, an explicit assertion that the person may end the encounter is stronger medicine.") Furthermore, because Sims was in handcuffs, and for at least part of the interrogation, located in the back of a police vehicle which he could not leave on his own, the Court finds that Sims

reasonably believed he was in custody. Additionally, the atmosphere of the questioning was police dominated, with at least five officers present at the scene. Finally, Sims was placed under arrest immediately following the termination of the interrogation.

For all of these reasons, the Court concludes that Sergeant Cleveland's questioning amounted to a custodial interrogation. Having failed to provide Sims with the Miranda warning prior to questioning, the Court recommends that his motion to suppress statements be granted with regard to those statements made in response to Sergeant Cleveland's questioning.

### C. Sergeant Jensen's Interrogation

Sims contended that because Sims' first interrogation by Sergeant Cleveland was illegally obtained, the second interview by Sergeant Jensen must be suppressed as "fruit of the poisonous tree." Def. Mem., p. 8 (citing Wong Sun v. United States, 371 U.S. 471, 488 (1963)). Of course, as Sims' recognized, not all Mirandized statements are tainted by the earlier failure of the police to provide Miranda warnings and must be excluded as "fruit of the poisonous tree." Id. In Oregon v. Elstad, the United States Supreme Court held that statements made after a knowing and voluntary waiver of Miranda rights are admissible unless there were earlier unwarned statements resulted from coercion or a calculated effort to undermine a suspect's free will. 470 U.S. 298, 309 (1985). "However, if a deliberate strategy was used to avoid Miranda requirements, Elstad does not apply, and post-warning statements related to the substance of what was said earlier are inadmissible in the absence of curative measures." U.S. v. Gross, Crim. No. 08-254 (MJD/JJK), 2009 WL 430503 at *89 (D. Minn. Feb. 20, 2009) (citing Missouri v. Siebert, 542 U.S. 600, 621-22 (Kennedy, J., concurring in the judgment)).

(2004)).[1]  Thus, when a two-part interrogation technique is used, post-warning statements are only suppressed if this technique deliberately used to render Miranda warnings ineffective. Ollie, 442 F.3d at 1142 (citing Siebert, 542, U.S. at 621-622 (Kennedy, J., concurring)). Further, the burden is on the prosecution to demonstrate "by a preponderance of the evidence, that the officer's failure to provide warnings at the outset of the questioning was not part of a deliberate attempt to circumvent Miranda." Id. at 1143. Ultimately, interrogating officers must provide some explanation as to why they did not read suspects their Miranda warnings in order to meet the Ollie burden. See Gross, 2009 WL 430503 at *9 ("Given the Government's lack of explanation about why they started the discussion with Defendant in the confines of the minivan, it is reasonable to infer that the purpose of this technique was to create an intimidating setting and make it more likely that Defendant would not exercise his right to remain silent.").

In U.S. v. Ladoucer, the court found that the Government had failed to meet this burden when it relied solely on the testimony of one officer who stated that he had simply forgotten to read the Miranda warning. Crim No. 07-165(1) (ADM/JSM), 2007

---

[1] In Siebert, the United States Supreme Court held that the practice of the two-part interrogation technique was unconstitutional. A two-part interrogation technique involves officers eliciting incriminating statements before reading suspects their Miranda warnings, then reading those warnings and re-interrogating the suspect to elicit the same testimony. Siebert, 542 U.S. at 609-611. The plurality opinion in Siebert suggested that a fact-based inquiry should determine whether post-warning statements are admissible. Id. at 615-616. The plurality considered such factors as the location and length of the first and second inquiries as well as the degree to which the inquiries contained overlapping content. Justice Kennedy's concurrence provided the decisive fifth vote. Id. at 618-622. Justice Kennedy held that a narrower inquiry into the interrogating officer's subjective state of mind was more appropriate and maintained that the plurality's multi-factor approach undermined the clarity of Miranda. Id. at 622. The Eighth Circuit subsequently adopted Justice Kennedy's concurrence as controlling. U.S. v. Thomas, 664 F.3d 217, 223 (8th Cir. 2011).

WL 3051434 at *5 (D. Minn. Oct. 17, 2007). In reaching its conclusion, the court found it significant that there were no "hurried, unusual, or exigent circumstances" that may have caused the officer's forgetfulness. Id. The court also relied on the fact that the officer failed to take curative measures, such as informing the defendant of the previous failure to provide warning and explaining the implications of such failure. Id.

In Gross, the court explained that even though the location of the interrogation had changed and several hours had passed, questioning on similar issues did not give the defendant an adequate opportunity to distinguish between the two contexts. 2009 WL 430503 at *11. The court further found that reference to the first interrogation during the second interrogation demonstrated that the second was merely a continuation of the first. Id.

The Court finds that the Government has failed to meet its burden of demonstrating that Sergeant Cleveland's failure to read Sims his Miranda warnings prior to questioning him was not deliberate. By the time he began the interrogation, Sims was clearly a suspect in the shooting. Sergeant Cleveland had received reports of an individual matching Sims description enter the barber shop holding a gun. A revolver was found on the floor of the hallway leading to the restroom of the barber shop. Another eyewitness reported that Sims had walked towards the bathroom and returned shortly thereafter. Following Sims' apprehension, Sergeant Cleveland frisked, handcuffed and put Sims in Officer Ludvik's squad car, and obtained a positive identification of Sims as the suspect. Sergeant Cleveland did not cite any exigent circumstances to justify his failure to read the warning. Further, neither Sergeant Cleveland nor Sergeant Jensen attempted to cure the error by explaining to Sims that

the warning should have been given or detailing the implications. While the two interrogations were not identical, the incriminating questions pertaining to the charges brought against Sims were asked in both interrogations such as whether his DNA would be found on the weapon and whether he had handled the weapon in the past. Sergeant Jensen directly referenced Sergeant Cleveland's interrogation when speaking with Sims. Furthermore, Sergeant Jensen testified that he relied on the prior interrogation when questioning Sims. Most critically, the Government elicited no testimony to explain why Sergeant Cleveland, a police officer of 25 years, failed to read Sims his <u>Miranda</u> warning. Sergeant Cleveland testified he did not read Sims the <u>Miranda</u> warning before questioning him because he did not feel that he had probable cause to affect an arrest. Even if true, where Sims was a suspect and in the custody of law enforcement at the time of questioning, the Court finds that this explanation did not justify ignoring the requirement to provide Sims with the <u>Miranda</u> warnings, and does not satisfy the Government's burden of demonstrating that the failure was not deliberate. For all of these reasons, the Court finds that the statements given by Sims to Sergeant Jensen are the fruit of the poisonous tree and recommends that Sims' motion to suppress statements be granted with regard to the statements made to Sergeant Jensen.

## **RECOMMENDATION**

For the reasons set forth above and based on all the files, records, and proceedings herein, it is recommended that:

1. Cebrian Omar Sims' Motion to Suppress Eyewitness Identifications [Docket No. 21] be **DENIED**.

2. Cebrian Omar Sims' Motion to Suppress Statements, Admissions and Answers [Docket No. 22] be **GRANTED** with regard to all statements made in response to Sergeant Cleveland's questioning.

3. Cebrian Omar Sims' Motion to Suppress Statements, Admissions and Answers [Docket No. 22] be **GRANTED** with regard to all statements made in response to Sergeant Jensen's questioning.

Dated: July 29, 2013

s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 12, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. A party may respond to the objecting party's brief within 14 days after service thereof. All briefs filed under this Rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing on or before **August 12, 2013**.